SKC

WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

James Francis,

                        Plaintiff,

v.

David Shinn, et al.,

                        Defendants.

No. CV-22-02071-PHX-JAT (DMF)

**ORDER**

Plaintiff James Francis, who is currently confined in the Arizona State Prison Complex (ASPC)-Eyman, Cook Unit, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff filed a Motion for Summary Judgment (Doc. 50), and Defendants Arizona Department of Corrections, Rehabilitation and Reentry (ADCRR) Director Ryan Thornell, former and current ADCRR contracted healthcare providers Centurion and Naphcare, Dr. Rodney Stewart, and Nurse Practitioner (NP) Siji Thomas filed a Response and Cross Motion Summary Judgment.  (Doc. 75.)  Plaintiff was informed of his rights and obligations to respond to Defendants' Cross Motion pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 77), and he did not file a response, though he sought and was granted additional time to do so.  (Doc. 78, Doc. 79.)

The Court will deny Plaintiff's Motion for Summary Judgment, and grant in part and deny in part Defendants' Cross Motion for Summary Judgment.

. . . .

. . . .

## I.      Background

On screening Plaintiff's six-count Complaint under 28 U.S.C. § 1915A(a), the Court determined Plaintiff stated Eighth Amendment medical care claims against Defendants Director Shinn in his official capacity only, Centurion, Naphcare, Dr. Stewart, and NP Thomas based on their alleged failures to treat Plaintiff's cancer, and the Court directed these Defendants to answer the Complaint.  (Doc. 5.)[1]  The Court also ordered Defendants Shinn and Naphcare to Respond to Plaintiff's concurrently filed Emergency Motion for Preliminary Injunction and Temporary Restraining Order.  (*Id.*)

The Court granted Plaintiff's Motion for Preliminary Injunction and required Defendant Naphcare to provide Plaintiff a cystoscopy and any follow up care recommended by the offside specialist.  (Doc. 19.)  Defendants later filed Notices with the Court indicating the status of the ordered relief.  (Docs. 23, 24, 31, 42.)

## II.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

---

[1] Plaintiff named former ADCRR Director David Shinn in his Complaint, but the Court subsequently substituted Deputy Director Profiri and then current Director Thornell in his official capacity for Director Shinn.  (Docs. 19, 22.)

jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

### III.    Plaintiff's Motion for Summary Judgment

The Court will summarily deny Plaintiff's Motion for Summary Judgment because Plaintiff failed to "identify[] each claim . . . on which summary judgment is sought" or to show that he is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Plaintiff merely recounted portions of the Court's January 23, 2023 ruling on his Motion for Preliminary Injunction and argued in conclusory fashion that the findings in that Order demonstrated that all Defendants were collectively deliberately indifferent to his serious medical needs.  (Doc. 50 at 9−10.)  The Court previously found only that Plaintiff had shown a likelihood of success on the merits of his deliberate indifference claims based on the unexplained delay in scheduling Plaintiff for a cystoscopy at that time.  (*See* Doc. 19 at 11−12.)[2]  It did not find that Plaintiff was entitled to judgment as a matter

---

[2] The Court relied on radiologist Dr. Rishi Gosalia's August 28, 2022 recommendation that Plaintiff undergo a cystoscopy based on the results of Plaintiff's August 26, 2022 CT scan (*see* Doc. 14-1 at 2−3), but the Court misread the date on the CT scan as June (not August) 26, 2022 and therefore erroneously found there had been a nearly three-month delay following this recommendation before Plaintiff had a follow up urology appointment on September 22, 2022, and a five-month delay between this recommendation and Plaintiff's then-scheduled cystoscopy, which was to take place on December 6, 2022.

of law against any named Defendant.  Moreover, merely recounting the Court's findings on the available facts at that time does not satisfy Plaintiff's burden of identifying the undisputed facts in the record that show he is entitled to judgment as a matter of law.  But even if this were sufficient, Plaintiff's Motion fails since "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits," because "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits" in order to preserve the relative positions of the parties until a trial on the merits can be held.  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, (1981).

The court is mindful of the Ninth Circuit's overarching caution in this context that district courts are to "construe liberally motion papers and pleadings filed by pro se [prisoners] and . . . avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir.2010).  For this reason, the Court will still consider any relevant, supported facts set forth in either Plaintiff's Motion for Summary Judgment or his Statement of Facts.[3]  Because Plaintiff did not respond to Defendants' Cross Motion for Summary Judgment, the Court will also consider Plaintiff's first-hand allegations in the verified Complaint as an affidavit in opposition to that Motion.  Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion.  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

**IV.  Facts**

Plaintiff's claims are based on his medical care at ASPC-Eyman, Cook Unit, from January 2022 to December 2022.  (Doc. 1 at 5, 6, 19.)  During this time, Centurion was

_____

(Doc. 19 at 11.)

[3] Plaintiff included 30 numbered paragraphs of facts in his Motion for Summary Judgment, some of which he then claimed were "undisputed" in his corresponding 30-paragraph Separate Statement of Facts, even though Defendants had not yet had an opportunity to respond to those facts. (*See* Docs. 50, 51 ¶¶ 2−5.) Plaintiff's Statement of Facts otherwise appears largely to reproduce the same facts already included in his Motion. In the interest of thoroughness, the Court will consider both sets of facts.

responsible for Plaintiff's medical care up to October 1, 2022, which is when Naphcare took over as ADCRR's contracted healthcare provider.  (*Id.* ¶ 16; Doc 73, Defs.' Separate Statement of Facts (DSOF) ¶ 17.)[4]  Defendant NP Thomas was responsible for providing medical care to ASPC-Eyman prisoners, first under Centurion, when she was the primary provider for prisoners in the Cook Unit, including Plaintiff, and then under Naphcare, when she was assigned to a new Unit and was no longer responsible for Plaintiff's care.  (*Id.* ¶¶ 18−19.)  Over the same time, Dr. Stewart was the ASPC-Eyman Site Medical Director under Centurion, and he remained in this role under Naphcare.  (DSOF ¶ 47.)

On January 11, 2022, Plaintiff alerted ADCRR staff that he was urinating blood, and staff looked in Plaintiff's toilet and noted blood in his urine, so they initiated an emergency ICS (Incident Command System) and took Plaintiff to the Cook Medical Unit, where he was evaluated by medical staff.  (Doc. 1 at 6; Doc. 50 ¶ 4.)  According to Plaintiff, unnamed medical staff said it was normal to bleed from cancer, and they would continue to monitor him.  (Doc. 1 at 6.)[5]  Plaintiff also alleges that NP Thomas evaluated him and told him she did not think his bleeding was related to his cancer and that males sometimes urinate blood due to injury.  (*Id.* at 12.)  Centurion's printout of all Plaintiff's health service requests and health service encounters does not show that Plaintiff complained of or was seen for this issue on January 11, 2022, and NP Thomas avows that she did not see Plaintiff that day, and she did not tell him he had cancer or that it was normal for males to urinate blood from an injury.  (Doc. 73-3 at 2; Doc. 73-9 at 25; Doc. 73-2, Thomas Decl. ¶ 6.)

The next day, January 12, 2022, Plaintiff saw Registered Nurse (RN) Stephanie Ostrom in response to an HNR (health needs request) that Plaintiff reported submitting

---

[4] Defendants state that Naphcare took over as ADCRR's healthcare provider on October 1, 2023, not 2022, but the year appears to be a typographical error because Centurion's medical records for Plaintiff only go up to September 29, 2022 (*see* Doc. 73-3 at 2), and Defendant Thomas avows she told Plaintiff a new medical provider would be taking over for Centurion on October 1, 2022.  (Doc. 73-2 (Thomas Decl.) ¶ 29.)

[5] Plaintiff did not allege any facts showing he had ever been diagnosed with cancer or was being treated for cancer at that time.

1   weeks before, complaining of recurring blood in his urine and having an urge to void every

2   20−30 minutes.  (DSOF ¶ 23.)  Plaintiff told Nurse Ostrom he was no longer having this

3   problem.  (*Id.*)[6]

4   　　　　On January 26, 2022, NP Thomas saw Plaintiff for follow up regarding his A1C

5   labs, and Plaintiff said he was having cold symptoms but did not complain of blood in his

6   urine.  (*Id.* ¶ 25.)[7]  NP Thomas conducted an exam, and noted a soft, non-tender abdomen

7   and no bowel sounds or masses.  (*Id.*)  NP Thomas's differential diagnoses for Plaintiff's

8   cold symptoms was asthma versus possible flu versus possible COVID, and she requested

9   a COVID test and cold/flu medications; she also requested new labs prior to Plaintiff's next

10   clinic visit.  (*Id.* ¶ 26.)

11   　　　　From February 2022 through June 2022, Plaintiff did not submit any HNRs

12   regarding blood in his urine or any other urological issues but only for unrelated issues,

13   such as prescription refill requests, which NP Thomas addressed, and a complaint of chest

14   pain, for which NP Thomas gave Plaintiff an EKG.  (*Id.* ¶ 27.)  Over this time, NP Thomas

15   also saw Plaintiff for chronic care visits regarding his history of stroke in 2017, history of

16   skin cancer, and for his current diabetes, asthma, and high blood pressure.  (*Id.*)

17   　　　　Plaintiff alleges that, on February 22, 2022, he complained to ADCRR staff of chest

18   and stomach pain, and staff took him to the Cook Medical Unit.  (Doc. 1 at 7.)  Plaintiff

19   was told by unnamed medical staff that his heart pain was due to his cancer and would

20   continue until they got his cancer under control.  (*Id.*)  Plaintiff alleges he was put on

21   monitoring but not treated for his cancer.  (*Id.*)  He also alleges that he saw NP Thomas at

22   _____

23   　　　　[6] Defendants further claim that Plaintiff had stable vitals and no other complaints at

24   this visit and was told to submit an HNR as needed going forward (DSOF ¶ 23), but they
     do not cite to specific pages of this record, and the Plan Notes and Education Notes from

25   the visit state only "HNR PRN."  (Doc. 73-8 at 27.)

26   　　　　[7] Based on publicly available information from the National Institute of Health,

27   "[t]he A1C test is a blood test that provides information about your average levels of blood
     glucose, also called blood sugar, over the past 3 months" and is the primary lab test used

28   for pre-diabetes/diabetes diagnosis and management.  *See* https://www.niddk.nih.gov
     /health-information /diagnostic-tests/a1c-test; https://perma .cc/B5VH-Q4DJ.

this visit, and she hooked him up to an EKG and told him he was having heart problems but said she would monitor the issue and did not provide heart treatment. (*Id.* at 13.) She also told plaintiff that his pain from his suspected cancer was normal and she would continue to monitor that condition. (*Id.*)

On July 5, 2022, Plaintiff submitted an HNR, stating "please set me up with [the] doctors line for my g[a]ll bladder. It's painful to the touch. Don't know why," and he was seen on the nursing line. (DSOF ¶ 29.) Plaintiff states that, on July 5, 2022, he notified ADCRR staff that he was urinating blood, and staff noted blood in his toilet and took him to the Medical Unit. (Doc. 1 at 7.) According to Plaintiff, medical staff, including NP Thomas, told Plaintiff it was possible his cancer was spreading, and he would need an outside cancer consultation. (*Id.* at 7, 14.) Plaintiff claims NP Thomas told him she was putting in a request for "a cancer evaluation at the cancer center" and it would take 2−3 months to get approval, but Plaintiff should be patient because, "cancer won't kill him in 2−3 months." (*Id.* at 14.) NP Thomas denies she ever said this. (DSOF ¶ 39.)

According to Plaintiff's medical records, Plaintiff had a nursing line encounter on July 5, 2022 in which he complained of abdominal pain, mostly after eating, and that he had 3 days of mostly hard bowel movements. (*Id.* at 29; Doc. 73-7 at 12.) Upon evaluation, Plaintiff's abdomen was distended with positive bowel sounds. (*Id.*) He was assessed with right abdominal pain and constipation and referred to a provider. (Doc. 73-7 at 12, 14, 16.)

On July 13, 2022, Plaintiff saw NP Thomas for follow up care, and he complained of abdominal pain for the last 3 months, abdominal pain and cramping for the last month, no vomiting or nausea, and on-and-off diarrhea for the past 3.5 weeks. (DSOF ¶ 33; Doc. 73-4 at 28.) He also reported blood in his urine since the last year and irritation and burning during urination. (Doc. 73-4 at 28.) Upon examination, Plaintiff had a soft, non-distended abdomen with active bowel sounds and tenderness in the right upper and left lower quadrants. (DSOF ¶ 33; Doc. 73-3, Thomas Decl. ¶ 15.) NP Thomas's differential diagnosis was possible cholelithiasis versus gastritis versus IBS versus possible renal calculi versus cystitis versus bladder or prostate cancer versus UTI versus chronic

prostatitis. (Thomas Decl. ¶ 15.) Due to the numerous possible causes, NP Thomas ordered labs, to include a PSA, urine culture, urinalysis, and abdominal ultrasound. (*Id.*)[8]

The next day, July 14, 2022, Plaintiff's labs were taken, and the ultrasound was approved and scheduled. (DSOF ¶ 32.) The labs were evaluated within a few days, and the ultrasound took place on July 29, 2022. (*Id.*) Plaintiff's labs showed a normal PSA, negative urine culture, a normal diagnostic panel for anything unrelated to diabetes, and an abnormal urinalysis, for which NP Thomas made a follow-up provider appointment. (*Id.*)

On July 29, 2022, Plaintiff saw NP Thomas to address the results of his labs and ultrasound, which indicated cholelithiasis (gallbladder stones). (*Id.* ¶ 33.) Because of Plaintiff's reports of abdominal pain, diarrhea, dark colored urine, and pain on urination, NP Thomas submitted a request for an offsite nephrology consult, a general surgeon consult regarding Plaintiff's possible gallbladder stones, and a follow-up renal ultrasound. (*Id.*)

Plaintiff's renal ultrasound was approved on August 1, 2022 and scheduled to take place on August 31, 2022, but it was later rescheduled to take place on September 8, 2022 due to room availability. (Doc. 73-8 at 81, 83; Doc. 73-2, Thomas Decl. ¶ 19.) Plaintiff's nephrology consult was approved on August 2, 2022, and scheduled to take place on August 17, 2022. (Doc. 73-8 at 73.) Plaintiff's general surgery consult was approved on August 11, 2022, was scheduled and rescheduled twice, and was eventually completed on September 29, 2022. (*Id.* at 88.)

On August 16, 2022, Plaintiff saw outside nephrologist Dr. Masood, and Dr. Masood ordered a STAT CT of the abdomen and pelvis. (DSOF ¶ 35.) NP Thomas submitted a consult request for the CT, which was approved in less than one week, and the CT was performed on August 26, 2022. (*Id.*) It was not until the CT that it was discovered Plaintiff had a urinary bladder mass. (*Id.*) The results showed gallstones and a 2.8 x 2.1

---

[8] PSA stands for Prostate-specific antigen, and a PSA test is "used by health care providers for individuals who report prostate symptoms to help determine the nature of the problem." *See* https://www.cancer.gov/types/prostate/psa-fact-sheet; https://perma.cc/V4FZ-5GX8.

cm mass along the left wall of the urinary bladder, suggestive of malignancy, and the radiologist recommended a cystoscopy. (*Id*; Doc 14-1 at 2−3.) NP Thomas submitted a request for a follow up consult with Dr. Masood, and Plaintiff was taken back to Dr. Massood on September 6, 2022. (DSOF ¶ 36.)

At Plaintiff's September 6, 2022 follow-up, Dr. Masood reviewed the August 26, 2022 CT scan and recommended an urgent urological consult, STAT CBC, CMP, and a UA, and treatment with Pepcid 20 mg twice a day, with a follow up in 3−4 months. (*Id.*; Doc. 73-9 at 37.)

On September 7, 2022, Plaintiff alleges that Centurion medical staff, including NP Thomas told him not to use the word "leukemia" in his HNRs or when talking to medical staff because they would not know until Plaintiff had a cancer consult what type of cancer Plaintiff had, and medical staff threatened they would write Plaintiff a disciplinary ticket if he kept using the work "leukemia." (Doc. 1 at 8, 14.) NP Thomas denies that she ever said these things or threatened Plaintiff with a disciplinary ticket. (DSOF ¶ 39.)

According to Plaintiff's medical records, NP Karanja-Adams saw Plaintiff on September 7, 2022 for a scheduled sick call for nausea, vomiting, and diarrhea, but Plaintiff denied these symptoms and only requested his medical records, saying "My daughter is a doctor" and she would review the records for him. (Doc. 73-3 at 28.) NP Karanja-Adams noted that Plaintiff "continues to have hematuria and Abd pain" and that he already had an urgent urology consult in place. (*Id.*)

On September 10, 2022, Plaintiff alleges that unnamed "Centurion medical staff" told him his urology consult had been cancelled and would be rescheduled as soon as possible, and that, under Centurion policy, medical staff could cancel any outside medical appointment and, due to security concerns, did not need to inform Plaintiff of the reason for doing so. (Doc. 1 at 8.) Plaintiff also alleges that NP Thomas told him that Dr. Stewart told her Plaintiff's urology appointment would have to wait until after a new medical provider took over for Corizon on October 1, 2022. (Doc. 1 at 15.) Dr. Stewart denies he said this to NP Thomas. (DSOF ¶ 51.) Dr. Stewart did not have any role in approving or

denying consult requests for Plaintiff, and he was not responsible for scheduling Plaintiff's urology appointments or follow ups, which was the responsibility of Plaintiff's primary providers.  (*Id.* ¶¶ 53, 54.)

On September 12, 2022, Plaintiff saw NP Karanja-Adams for follow-up on his hematuria and CT findings, and Dr. Stewart sat in on the visit.  (DSOF ¶ 40; Doc. 73-3 at 18.)  According to the medical encounter record, Plaintiff reported chronic back pain but denied chest pain, he had "no hematuria today or significant/worsening pain at this time," and he stated he was "feeling ok today." (Doc. 73-3 at 18.)  The medical record also notes that Plaintiff was scheduled for an upcoming specialist appointment to assess his bladder mass.  (*Id.*)  Dr. Stewart sat in on this encounter to corroborate what NP Karanja-Adams told Plaintiff, which was that he was going to be seen further about his bladder issues, and to verify that Plaintiff reported he was feeling ok that day and understood the plan of care. (DSOF ¶52.)

On September 13, 2022, Plaintiff alleges that he once again told ADCRR staff that he had blood in his urine, and ADCRR staff verified this by looking at the urine in Plaintiff's toilet and brought him to medical.  (Doc. 1 at 9.)  Plaintiff alleges that Centurion medical staff told him that Centurion had not approved his "cancer consultation" because Centurion's contract with ADCRR was ending on October 1, 2022, and Plaintiff's cancer was "not that bad." (*Id.*)  Plaintiff argued that the blood in his urine showed his cancer was not only serious but life-threatening, but medical staff told Plaintiff they could cancel any outside consultations, and Plaintiff would have to wait until after October 1, 2022 to get medical care for his cancer.  (*Id.*)  Plaintiff also alleges that he saw NP Thomas, and NP Thomas sent him to the restroom to produce a urine sample in a cup, and the urine he brought back contained blood, and she then had him do this every two hours for the next six hours, and each time, the urine contained blood.  (*Id.* at 15.)  Plaintiff "was told" that his PSA test showed cancer but he would have to wait until October 2022 when a new medical provider took over to get treatment.  (*Id.*)  A printout of Plaintiff's medical encounters over the relevant period does not show that Plaintiff had a medical encounter

on September 13, 2022; it shows only that he saw NP Karanja-Adams and Dr. Stewart on September 12, 2022, and they informed him of his upcoming urology appointment. (DSOF ¶ 40; Doc. 73-3 at 2, 18−22.)

On September 15, 2022, Plaintiff was taken to his scheduled urology appointment, but when he arrived, the urology clinic explained for the first time that the visit was not to be "in person" and rescheduled Plaintiff for a telemed appointment on September 22, 2022, which was the next available appointment. (Doc. 73-2, Thomas Decl. ¶ 21.)

On September 22, 2022, Plaintiff had a telemed urology consult with NP Maryjoy Balbarino, and NP Balbarino discussed having an office cystoscopy, which she noted was already scheduled for September 28, 2022. (Doc. 14-1 at 4.) NP Balbinaro explained that a cystoscopy is a diagnostic procedure used to assess lower urinary tract symptoms/diseases that is typically performed under local anesthetic. (*Id.*) She explained that a biopsy may be taken, and a sample from the bladder washing may be sent for laboratory testing. (*Id.*) She also reviewed the potential risks of the procedure, and Plaintiff consented to a cystoscopy to be scheduled for another day. (*Id.* at 4−5.) According to NP Thomas, the cystoscopy was not already scheduled to take place on September 28, 2022, as NP Balbarino noted; instead, Plaintiff was scheduled to see the general surgeon on September 28, 2022 to assess Plaintiff's gallstones and cholelithiasis. (Doc. 73-2, Thomas Decl. ¶ 22.)

On September 28, 2022, Plaintiff was taken to his scheduled general surgery consult for his gallstones and cholelithiasis, and the surgeon recommended umbilical hernia repair surgery, to be scheduled after work up for the urinary bladder mass was complete. (DSOF ¶ 38; Doc. 73-9.)

On September 29, 2022, NP Thomas saw Plaintiff for follow up care, and Plaintiff requested another offsite consult, but NP Thomas informed him that an urgent urology consult had already been placed. (DSOF ¶ 41; Doc. 73-3 at 6.) Plaintiff's medical records show that NP Thomas requested an offsite cystoscopy for Plaintiff on an urgent basis earlier that same day, and it was approved on September 30, 2022. (Doc. 51 (Pl.'s

Statement of facts (PSOF) ¶ 17; Doc. 14-1 at 6−7.)  At the September 29, 2022 visit, NP Thomas checked Plaintiff's vitals, which were normal, and issued an SNO (special needs request) for medical shoes.  (*Id.*)  She also explained to Plaintiff that, when Naphcare took over as ADCRR's healthcare provider on October 1, 2022, NP Karanja-Adams would become the primary care medical provider on Plaintiff's unit and would be taking over his care.  (DSOF ¶ 42.)

On October 1, 2022, Naphcare took over as ADCRR's healthcare provider.  (DSOF ¶ 17.)  At some point thereafter, Naphcare scheduled Plaintiff for a cystoscopy and bladder mass biopsy to take place on December 6, 2022 at the Banner University Medicine Urology Institute.  (PSOF ¶ 18; Doc. 14-1 at 9−10.)  Naphcare's scheduling notes indicate that the clinic cancelled that appointment because the doctor was unavailable, and Naphcare staff rescheduled it for February [redacted] 2023.  (*Id.*)

There is no record Plaintiff was ever seen at the Banner University Medicine Urology Institute, though Plaintiff produced records showing he was seen by Dr. Rahul Mehan at the East Valley Urology Center on January 27, 2023. (PCSOF ¶ 21; Doc 51-1 at 15.)  Dr. Mehan recommended a follow up cystoscopy in the operating room for bladder tumor removal, TURBT (transurethral resection of the bladder tumor), and stricture dilation.  (*Id.* at 17.)[9]  The partial records Plaintiff produced show that Plaintiff was also seen for the same issue by a different provider at Arizona Urology Specialists three days later, on January 30, 2023, and that provider stated, "Based on his imaging and persistent symptoms, I think this patient needs to go to the operating room for cystoscopy, transurethral resection of the bladder tumor with Mitomycin-C instillation.  We will see if we can get this scheduled as soon as possible."  (*Id.* at 16.)

. . . .

---

[9] Based on publicly available information from the American Cancer Society, TURBT is a surgical procedure performed under general anesthesia in which a scope is inserted through the urethra into the bladder, and abnormal tissues or tumors are removed and sent to a lab for testing.  *See* https://www.cancer.org/cancer/types/bladder-cancer/treating/surgery.html; https://perma.cc/UKH7-CYNH

1    **V.    Defendants' Motion for Summary Judgment**

2        **A.    Eighth Amendment Legal Standard**

3        To prevail on an Eighth Amendment medical claim, a prisoner must demonstrate

4    "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096

5    (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs

6    to this analysis: an objective prong and a subjective prong.  As to the objective prong, a

7    prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted).

8    Examples of indications that a prisoner has a serious medical need include "[t]he existence

9    of an injury that a reasonable doctor or patient would find important and worthy of

10   comment or treatment; the presence of a medical condition that significantly affects an

11   individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*,

12   974 F.2d 1050, 1059−60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc.*

13   *v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

14       As to the subjective prong, a prisoner must show that the defendant's response to

15   that need was deliberately indifferent.  *Jett*, 439 F.3d at 1096.  An official acts with

16   deliberate indifference if she "knows of and disregards an excessive risk to inmate health

17   or safety; the official must both be aware of facts from which the inference could be drawn

18   that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*,

19   *v. Brennan*, 511 U.S. 825, 837 (1994).  "Prison officials are deliberately indifferent to a

20   prisoner's serious medical needs when they deny, delay, or intentionally interfere with

21   medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.2002) (internal citations

22   and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible

23   medical need.  *Jett*, 439 F.3d at 1096.  But the deliberate-indifference doctrine is limited;

24   an inadvertent failure to provide adequate medical care or negligence in diagnosing or

25   treating a medical condition does not support an Eighth Amendment claim.  *Wilhelm v.*

26   *Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted); *see Estelle*, 429 U.S. at

27   106 (negligence does not rise to the level of a constitutional violation).  Further, a mere

28   difference in medical opinion does not establish deliberate indifference.  *Jackson v.*

1    *McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

2         **B.     NP Thomas and Dr. Stewart**

3         Defendants do not dispute that Plaintiff had a serious medical need, and Plaintiff's

4    firsthand allegations in the Complaint and the medical record evidence showing he had

5    blood in his urine and was later diagnosed with a bladder mass and bladder cancer,

6    requiring specialist consultations, are sufficient to make this showing.  The Court therefore

7    moves to the subjective prong—whether Defendants' responses to Plaintiff's serious

8    medical need were deliberately indifferent.  *See Jett*, 439 F.3d at 1096.

9         Defendants argue that Plaintiff cannot make this showing as to Defendants Thomas

10   or Stewart because the medical record of Plaintiff's treatment from January 2022—when

11   Plaintiff alleges he first complained of blood in his urine—through September 2022, during

12   which both Defendants provided medical care to Plaintiff, continuing into 2023, when Dr.

13   Stewart continued to oversee Plaintiff's medical treatment, does not show that either

14   Defendant was deliberately indifferent to Plaintiff's bladder mass.  (Doc. 75 at 15.)

15        Based on Defendants' facts, Thomas's only involvement in Plaintiff's medical care

16   between January 10, 2022 and January 26, 2022 was to renew Plaintiff's medications for

17   his known medical issues unrelated to his bladder.  (*Id.* at 5.)  Then, on January 26, 2022,

18   when Thomas saw Plaintiff to follow up on his A1C labs, Plaintiff only complained of

19   cold/flu-like symptoms, which Thomas addressed by ordering a COVID test and

20   prescribing cold and flu medications.  (*Id.*)  Even though Plaintiff did not report blood in

21   his urine or abdominal pain at that time, Thomas also conducted an abdominal exam, which

22   showed a soft, non-tender abdomen with no masses.  (*Id.*)

23        Defendants' evidence also shows that, from February 2022 through June 2022,

24   Plaintiff did not submit any HNRs regarding abdominal issues or blood in his urine.  (*Id.*

25   at 6; *see* DSOF ¶ 27.)  Instead, it was not until July 5, 2022 that Plaintiff submitted an HNR

26   in which he complained of any abdominal issues, which he described at the time as

27   unexplained gall bladder pain.  (*Id.*)  Then, on July 13, 2022, when Thomas saw Plaintiff

28   for follow up care, Plaintiff reported to her for the first time that, since the previous year,

he regularly had blood in his urine and experienced irritation/burning during urination. (*Id.* at 6; *see* Doc. 73-4 at 28.)  The evidence shows that Thomas then made a differential diagnosis of several possible causes of these symptoms and ordered diagnostic tests, included a PSA test, a urine culture, urinalysis, and an abdominal ultrasound. (Doc. 75 at 7; *see* DSOF ¶ 33; Doc. 73-3, Thomas Decl. ¶ 15.)

Based on the above, Defendant Thomas was not aware of any facts from which to infer that Plaintiff had any serious bladder issues, including any undetected masses or bladder cancer, until at least July 13, 2022 and could not have been deliberately indifferent to those needs prior to that time.  Plaintiff's first-hand allegations in the Complaint, though, create a genuine issue of material fact that Plaintiff made Thomas aware of blood in his urine as early as January 11, 2022, when ADCRR staff brought Plaintiff to medical, and Thomas evaluated him and said the blood was unrelated to his cancer and that males sometimes urinate blood due to an injury. (Doc. 1 at 6, 12.)

A reasonable jury believing these allegations could find that Defendant Thomas was unprofessional and negligent or grossly negligent in assessing the cause of Plaintiff's hematuria.  But absent additional facts showing that Thomas knew Plaintiff had cancer in January 2022 or what Plaintiff said to her about the blood in his urine at that time, these allegations are too vague to show that Thomas was aware of facts from which to infer Plaintiff had a serious medical need.  *See Farmer*, 511 U.S. at 837 (to show deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").  Moreover, the undisputed evidence shows that, the very next day, Plaintiff was seen in medical for an HNR regarding blood in his urine, and he told Nurse Ostrom that he was no longer having that problem. (DSOF ¶ 23.)  Plaintiff also did not complain of blood in his urine or any abdominal issues when he next saw Thomas on January 26, 2022 for follow up on his diabetes-related labs, and Thomas conducted an abdominal exam, which showed no tenderness or masses that would have alerted her that Plaintiff had a serious medical need beyond those that were already being addressed. (*Id.* ¶ 25.)

Plaintiff additionally alleged that, on February 22, 2022, ADCRR staff brought Plaintiff to medical for heart pain, and Defendant Thomas gave him an EKG and told him his heart pain was normal for his suspected cancer and she would continue to monitor these issues, but she did not provide any treatment. (*Id.* at 7, 13.) These allegations are also too vague to create a genuine issue of material fact that Thomas knew Plaintiff had a serious medical need and was deliberately indifferent to that need. Taking as true that Thomas erroneously or negligently correlated Plaintiff's heart complaints with cancer, there is no evidence Thomas was aware of any facts in February 2022 from which she could have inferred that Plaintiff had either a heart condition or cancer at that time. Plaintiff's medical records contain no evidence Plaintiff was ever diagnosed with a heart condition, either before or after this encounter; nor is there any evidence any medical provider, including Thomas, suspected that Plaintiff had bladder cancer or cancer of any kind prior to the battery of tests and consults Thomas ordered for him five months later, in July 2022.

Plaintiff also alleged that Defendant Thomas saw him for complaints of gall bladder pain on July 5, 2022, and she said she would order a cancer evaluation, which would take up to 2−3 months for approval, but she told him he would not die from cancer in 2−3 months. (Doc. 1 at 14.) But even if these facts suggest Thomas was momentarily callous and/or deliberately indifferent to Plaintiff's possible cancer at that time, taken together with the undisputed evidence from Plaintiff's medical records, Thomas saw Plaintiff for follow up on his gall bladder complaints on July 13, 2022, roughly one week later, and she ordered several diagnostic tests, each of which were either completed or approved and scheduled within a matter of days. (DSOF ¶ 33; Doc. 73-4 at 28; Doc. 73-8 at 81, 83, 88; Doc. 14-1 at 2−3.) Moreover, even at the July 13, 2022 medical encounter, the evidence does not support that Thomas knew Plaintiff had bladder cancer. Instead, she diagnosed several possible causes of Plaintiff's hematuria and other reported symptoms, including cholelithiasis, gastritis, IBS, renal calculi, cystitis, bladder or prostate cancer, UTI, or chronic prostatitis, which the tests she ordered were intended to either rule out or confirm. (DSOF ¶ 33.) These facts do not show or create a genuine issue of material fact that

Thomas deliberately disregarded any known serious medical needs that in her professional medical opinion might explain Plaintiff's symptoms.

The remaining evidence also does not make this showing. On July 29, 2022, Defendant Thomas followed up with Plaintiff on his labs and ultrasound and ordered additional specialist consults and a renal ultrasound. (DSOF ¶ 33.) Between then and September 29, 2022, when Thomas saw Plaintiff for the last time as his primary care provider, Plaintiff continued to receive regular diagnostic tests and specialty consults, including a renal ultrasound, a nephrology consult, a general surgery consult, and a telemed urology consult. Based on nephrologist Dr. Mamood's recommendation, Thomas also requested an urgent cystoscopy on September 29, 2022, and Centurion approved her request on September 30, 2022.

Although Plaintiff alleged that, on several occasions, he was told by Centurion staff that he would have to wait to receive recommended diagnostic tests or to see offsite specialists until October 1, 2022, when Naphcare took over as ADCRR's healthcare provider, the record evidence does not show any such delays. At most, some of Plaintiff's initial offsite appointments had to be rescheduled due to room or provider unavailability, but there is no evidence Defendant Thomas caused any cancellations or delays. Additionally, whenever unanticipated cancellations occurred, Plaintiff was promptly rescheduled for the next available appointments. (*See* Doc. 73-8 at 73, 81, 83; Doc. 73-2, Thomas Decl. ¶ 21.)

Because Plaintiff cannot show that Defendant Thomas was deliberately indifferent to any of his known serious medical needs, the Court will grant summary judgement to Defendant Thomas.

Plaintiff also cannot make this showing as to Defendant Stewart. The evidence shows that Stewart's only direct involvement in Plaintiff's medical care during the time Stewart served as the ASPC-Eyman Site Medical Director under Centurion was to take part in Plaintiff's September 12, 2022 medical visit with NP Karanja-Adams in follow up on Plaintiff's hematuria and CT findings. (DSOF ¶ 40.) At that time, Plaintiff was already

scheduled for a specialist appointment to assess his bladder mass, and he reported no worsening pain or hematuria and that he was "feeling Ok." (Doc. 73-3 at 18.)  Even though Plaintiff alleged that Centurion medical providers told him that, per Dr. Stewart, Plaintiff's care for these issues would have to wait until Naphcare took over for Centurion on October 1, 2022, the medical records, once again, do not show that any such delays occurred. Instead, for the remainder of his time under Centurion's care, Plaintiff continued to receive specialist visits and diagnostic tests for his bladder issues and suspected malignant bladder mass.  There is also no evidence Dr. Stewart made any decisions to deny or delay Plaintiff any recommended medical care, either under Centurion or Naphcare, and Dr. Stewart avows that he was not involved in approving or scheduling consults or providing recommended follow-up care, which was the responsibility of Plaintiff's primary care providers.  (Doc. 73-10, Stewart Decl. ¶¶ 7−10.)  The Court will grant summary judgement to Defendant Dr. Stewart.

### C.    Defendants Thornell, Centurion, and Naphcare

To maintain a claim against Defendant Thornell in his official capacity or against Defendants Centurion and Naphcare as private entities fulfilling a public function, Plaintiff must meet the test articulated in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978); *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities acting under color of state law).  Accordingly, these Defendants can only be held liable under § 1983 for their employees' civil rights deprivations if Plaintiff can show that an official policy or custom caused the constitutional violation. *Monell*, 436 U.S. at 694.  To make this showing, Plaintiff must demonstrate that (1) he was deprived of a constitutional right; (2) the State or private entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).  Further, if the policy or custom in question is an unwritten one, the plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well

settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

### 1.  Centurion

Plaintiff's *Monell* claim against Centurion fails as a matter of law because Plaintiff cannot show he suffered a constitutional violation under Centurion's care or that Centurion had a policy or custom that was deliberately indifferent to his serious medical needs. The Court already found that Plaintiff cannot show that Defendants NP Thomas or Dr. Stewart were deliberately indifferent to his serious medical needs. The evidence also does not support that any other medical providers who treated Plaintiff under Centurion, such as Nurse Ostrom or NP Karanja-Adams, failed to provide Plaintiff proper medical care. To the extent Plaintiff's claim is based on any delays in receiving offsite care due to scheduling issues, there is also no evidence any cancellations that required rescheduling were caused by Centurion medical providers or scheduling staff. There is also no evidence that Centurion had an official policy of delaying offsite care or a pattern of delays so "persistent and widespread" that it amounted to a "permanent and well settled" practice. *Monell*, 436 U.S. at 691. The Court will grant summary judgement to Defendant Centurion.

### 2.  Naphcare

Defendants have not met their initial burden of showing that Plaintiff's claim against Naphcare fails as a matter of law. Defendants did not produce any facts about the medical care Plaintiff received from Naphcare to demonstrate that Plaintiff cannot show a constitutional violation regarding his urgent medical need for bladder cancer treatment. Defendants also have not produced any facts regarding Naphcare's policies for scheduling urgent off-site consults to demonstrate that Naphcare did not have a policy or practice that amounted to deliberate indifference to Plaintiff's serious medical needs. To make this showing, Defendants rely solely on Dr. Stewart's declaration that "[t]here is no NaphCare

policy or practice that is causing any delays and certainly no policy or practice to deny [Plaintiff] any medically necessary care including outside specialist treatment." (Doc. 75 at 18; Doc. 73-10, Stewart Decl. ¶ 14.) This statement is conclusory and fails to meet Defendants' burden of setting forth relevant facts that "cannot be . . . genuinely disputed" in support of their Motion. Fed. R. Civ. P. 56(c)(1).

Even if Defendants intended to rely on Plaintiff's undisputed facts or their previous status reports to show that Plaintiff received constitutionally adequate medical care from Naphcare and that Naphcare did not have deliberately indifferent policies, Defendants do not cite to any other evidence beyond Dr. Stewart's conclusory claims to make these showings. *See* LRCiv 56.1(e) (requiring parties to provide "citations to the specific paragraph in the statement of facts that supports assertions . . . regarding any material fact on which the party relies").

Even considering Plaintiff's undisputed facts and Defendants' prior submissions, the facts about Plaintiff's medical care under Naphcare are incomplete and largely unsupported by coherent medical records, and they fail to demonstrate beyond dispute that Plaintiff received appropriate treatment for his bladder cancer. The evidence shows, in part, that Plaintiff was not initially scheduled to receive an offsite cystoscopy until December 6, 2022, even though NP Thomas requested—and Centurion approved—this procedure on an urgent basis more than two months earlier, on September 29 and 30, 2022. Absent additional facts to explain this delayed appointment or any evidence about the care Plaintiff later received after his cystoscopy eventually took place roughly two months later in late January 2024, it is not clear Plaintiff received constitutionally adequate care for his serious medical needs or that Naphcare had sufficient policies and practices in place to address those needs. Because Defendants have not met their initial burden on these showings, Naphcare is not entitled to judgment as a matter of law, and the Court will deny summary judgment to Naphcare.

### 3. Thornell

Because Naphcare is not entitled to summary judgment for its allegedly deliberately

indifferent medical care as ADCRR's contracted healthcare provider, and the ADCRR Director is the state official charged with caring for prisoners' needs under Arizona law, Ariz. Rev. Stat. § 41-1604, the Court will also deny summary judgment to Defendant Thornell in his official capacity for purposes of any potential injunctive relief. Plaintiff's official capacity claim against Thornell is, in effect, a claim against the State, which has Eleventh Amendment immunity, so Plaintiff is not entitled to damages on this claim. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). State officials may, however, be sued in their official capacities for prospective injunctive relief because "official-capacity actions for prospective relief are not treated as actions against the State." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985), 473 U.S., 159, 167, n.14 (1985) (citing *Ex Parte Young*, 209 U.S. 123 (1908)); *Flint v. Dennison*, 488 F.3d. 816, 825 (9th Cir. 2007) ("[A] suit for prospective injunctive relief provides a narrow, but well-established, exception to Eleventh Amendment immunity).

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Plaintiff's Motion for Summary Judgment (Doc. 50) and Defendants' Cross Motion for Summary Judgment (Doc. 75).

(2)     Plaintiff's Motion for Summary Judgment (Doc. 50) is **denied**.

(3)     Defendants' Cross Motion for Summary Judgment (Doc. 75) is **granted in part** as to Defendants Thomas, Stewart, and Centurion, and these Defendants are dismissed with prejudice; the Motion otherwise **denied**.

(4)     The remaining claims in this action are Plaintiff's Eighth Amendment *Monell* claims against Defendants Naphcare and Thornell.

(5)     This action is randomly referred to Magistrate Judge Jacqueline M Rateau to conduct a settlement conference.

. . . .

. . . .

1     (6)     Defense counsel shall arrange for the parties to jointly call Magistrate Judge

2     Rateau's chambers at (520) 205-4640 within 14 days to schedule a date for the settlement

3     conference.

4     Dated this 13th day of March, 2024.

James A. Teilborg
Senior United States District Judge